**Richard G. EVANS, Angela Romero, Linda Fowler, Paul Brown, Jane Doe, Martina Navratilova, Bret Tanberg, Priscilla Inkpen, John Miller, the Boulder Valley School District Re–2, the City and County of Denver, the City of Boulder, the City of Aspen, and the City Council of Aspen, Plaintiffs–Appellees,**

v.

**Roy ROMER, as Governor of the State of Colorado, Gale A. Norton, as Attorney General of the State of Colorado, and the State of Colorado, Defendants–Appellants.**

No. 93SA17.

Supreme Court of Colorado,
En Banc.

July 19, 1993.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Jeanne Winer, Joseph N. deRaismes, III, Boulder City Atty., Boulder, Holland & Hart, Gregory A. Eurich, Darlene M. Ebert, Denver Asst. City Atty., Denver, Edward M. Caswall, John P. Worcester, Aspen City Atty., Aspen, Matthew Coles, ACLU Lesbian & Gay Rights Project, New York City, Suzanne Goldberg, Lambda Legal Defense & Education Fund, Inc., New York City, Wilson, Sonsini, Goodrich & Rosati, Clyde J. Wadsworth, Palo Alto, CA, David H. Miller, American Civil Liberties Union, Denver, for plaintiffs-appellees.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Paul Farley, Deputy Atty. Gen., Denver, for defendants-appellants.

Martin Kuhn, Colorado Springs, Robert K. Skolrood, Tracy Louise Winn, Virginia Beach, VA, amicus curiae, for Colorado for Family Values.

Roger Westlund, Thornton, Jordan Lorence, Paonian Springs, VA, amicus curiae, for Institute in Basic Life Principles.

Center for Human Rights Advocacy, William M. Cohen, Boulder, amicus curiae, for American Jewish Committee, United

Church of Christ Office for Church in Society, Union of American Hebrew Congregations, Unitarian Universalist Ass'n, Anti-Defamation League.

Bredhoff & Kaiser, Robert H. Chanin, John M. West, Washington, DC, Martha R. Houser, Aurora, amicus curiae, for National Educ. Ass'n.

Theodore W. Rosen, David A. Braff, Penny Shane, Ralph Erich Jones, Eulalia M. Mack, Scott A. Kronland, New York City, amicus curiae, for AIDS Action Council.

Heller, Ehrman, White & McAuliffe, Stephen V. Bomse, San Francisco, CA, Feiger Collison & Killmer, Darold W. Killmer, Diane S. King, Denver, amicus curiae, for Colorado Bar Ass'n, Colorado Trial Lawyers Ass'n.

AFSCME Colorado Council 76, M. Patrick Steadman, Denver, AFL–CIO, Jack Dempsey, Kimberlee Keller, Washington, DC, amicus curiae, for American Federation of State, County and Municipal Employees, AFL–CIO.

Sherman & Howard, Keith M. Angle, Ireland Stapleton Pryor & Pascoe, Scot M. Peterson, Denver, amicus curiae, for Coalition of Associations of Mental Health Professionals.

Chief Justice ROVIRA delivered the Opinion of the Court.

Defendants, Roy Romer, Governor of the State of Colorado, Gale A. Norton, Attorney General of the State of Colorado, and the State of Colorado (referred to collectively as "defendants") appeal the trial court's entry of a preliminary injunction enjoining them from enforcing a voter-initiated amendment to the Colorado Constitution ("Amendment 2"). We affirm.

I

In May 1992, the requisite number of qualified voters submitted petitions to the secretary of state to present to the electorate a new section 30 to article II of the Colorado Constitution. The proposed constitutional amendment was put to the voters as Amendment 2 on November 3, 1992, and passed by a margin of 813,966 to 710,151 (53.4% to 46.6%).[1] The secretary of state certified the results on December 16, 1992, as required by article V, section 1, of the state constitution.

Amendment 2 provides:

**No Protected Status Based on Homosexual, Lesbian, or Bisexual Orientation.** Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status quota preferences, protected status or claim of discrimination. This Section of the Constitution shall be in all respects self-executing.

On November 12, 1992, Richard G. Evans, along with eight other persons ("individual plaintiffs"), and the Boulder Valley School District RE–2, the City and County of Denver, the City of Boulder, the City of Aspen, and the City Council of Aspen ("governmental plaintiffs") (referred to collectively as "plaintiffs") filed suit in Denver District Court to enjoin the enforcement of Amendment 2 claiming that the amendment is unconstitutional. This contention was premised on several state and federal constitutional provisions.[2]

---

**1.** Art. II, § 1, of the Colorado Constitution proclaims that "[a]ll political power is vested in and derived from the people; all government of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." Art. II, § 2, provides that "[t]he people of this state have the sole and exclusive right of governing themselves, as a free, sovereign and independent state; and to alter and abolish their constitution and form of

government whenever they may deem it necessary to their safety and happiness, provided, such change be not repugnant to the constitution of the United States."

**2.** The individual plaintiffs claim that Amendment 2 violates their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution because it fails to rationally advance a legitimate governmental

After plaintiffs' request for an expedited hearing on the merits was rejected, they filed a motion seeking to preliminarily enjoin the enforcement of Amendment 2 which was to go into effect on or before January 15, 1993.[3] In support of this motion, plaintiffs argued that Amendment 2 deprives them of the First Amendment right of free expression and their Fourteenth Amendment right to equal protection of the laws. The First Amendment claim was based on the contention that Amendment 2 eliminates all potential means of redress for private retaliation or discrimination against gay men, lesbians, and bisexuals. Accordingly, the First Amendment requires the government to demonstrate a compelling justification for exposing those who engage in expressive conduct to increased risk. This burden, plaintiffs maintained, could not be met by the state. The trial court neither addressed nor relied on this argument in rendering its decision.

Plaintiffs presented two separate arguments under the Equal Protection Clause. First, that Amendment 2 violates their right to equal protection of the laws insofar as it denies gay men, lesbians, and bisexuals the opportunity to participate equally in the political process. Second, that Amendment 2 lacks a rational basis for the burdens it imposes on gay men, lesbians, and bisexuals.

The trial court conducted an evidentiary hearing to consider the motion. Following its conclusion, the court issued a temporary restraining order. The next day, the trial court held that plaintiffs had met their burden under the six-part test of *Rathke v. MacFarlane*, 648 P.2d 648, 653–54 (Colo. 1982), which sets forth the applicable standard for the issuance of a preliminary injunction and accordingly, granted plaintiffs' motion barring the enforcement of Amendment 2 pending the outcome of a trial on the merits.[4]

More specifically (and of central importance to this appeal) the trial court concluded that plaintiffs had met the threshold requirement of *Rathke* by demonstrating that enjoining the enforcement of Amendment 2 was necessary to protect their right to equal protection of the laws under the United States Constitution. The court reached this conclusion by reasoning that Amendment 2 "may burden fundamental rights of an identifiable group." The fun-

interest and because it places unique burdens on plaintiffs' ability to participate equally in the political process. They also challenge the amendment on numerous First Amendment grounds including that it violates their right to petition their government for a redress of grievances; that it violates their rights to free expression and association; that it violates the constitutional prohibition against the establishment of religion; and that it is unconstitutionally vague. They also allege that the initiative process by which Amendment 2 was passed violates the Guarantee Clause of Article IV, Section 4, of the United States Constitution. Lastly, the individual plaintiffs allege that Amendment 2 prohibits state courts from enforcing statutes, regulations, ordinances, and policies concerning discrimination based on sexual orientation and therefore, violates the Supremacy and Due Process Clauses of the Federal Constitution and art. II, § 6, of the Colorado Constitution.

Two of the governmental plaintiffs urge that Amendment 2 be construed so as not to affect their home rule powers. The Boulder Valley School District RE–2 asserts that Amendment 2 may violate local control over educational policies protected by art. IX, § 15, of the Colorado Constitution. All of the governmental plaintiffs claim that the amendment subjects them to po-

tential liability under the Supremacy Clause of the Federal Constitution.

3. Art. V, § 1, of the Colorado Constitution provides that state constitutional amendments passed via the initiative process "shall take effect from and after the date of the official declaration of the vote thereon by proclamation of the governor, but not later than thirty days after the vote has been canvassed."

4. Under *Rathke*, before a trial court may issue a preliminary injunction, "the moving party must establish, as a threshold requirement, a clear showing that injunctive relief is necessary to protect existing ... fundamental constitutional rights." *Rathke*, 648 P.2d at 653. If this threshold requirement is met, the trial court must find that the moving party has demonstrated: a reasonable probability of success on the merits; a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; that there is no plain, speedy, and adequate remedy at law; that the granting of a preliminary injunction will not disserve the public interest; that the balance of equities favors the injunction; and that the injunction will preserve the status quo pending a trial on the merits. *Id.* at 653–54.

damental right, the court went on, was "the right not to have the State endorse and give effect to private biases." [5]

The trial court then determined that because Amendment 2 may burden a fundamental constitutional right, its constitutionality must be assessed by reference to the "strict scrutiny" standard of review. The court concluded that under this standard, plaintiffs had shown to a reasonable probability that Amendment 2 would be demonstrated to be unconstitutional beyond a reasonable doubt at a trial on the merits. *See Bollier v. People,* 635 P.2d 543, 545 (Colo. 1981) (statutes are presumed constitutional until and unless the contrary can be shown beyond a reasonable doubt).[6]

Defendants appealed pursuant to C.A.R. 1(a)(3), and we granted review. The basis of defendants' challenge to the preliminary injunction pertains only to the trial court's determination that the threshold requirement of *Rathke v. MacFarlane* had been met (*i.e.,* that injunctive relief is necessary to protect existing fundamental constitutional rights). Accordingly, the gravamen of defendants' allegation of error is their contention that the trial court "did not base its decision on any direct precedent," but rather "extrapolated from several federal court decisions" the right identified and allegedly infringed by Amendment 2. Moreover, defendants argue, there is no applicable legal precedent or established right under the Equal Protection Clause of the United States Constitution which Amendment 2 can be shown to infringe upon. Defendants conclude, therefore, that "the lower court's order was fundamentally flawed, and cannot be sustained."

Plaintiffs have presented to this court the same equal protection arguments that were made to, but not relied on by, the trial

court. They do not urge that we base our decision on the precise right identified and relied on by the trial court in rendering its decision. To the contrary, they have argued to this court that the right identified by the trial court, when "read in light of the arguments actually presented to [it] ... is best construed to mean that Amendment 2 violates the plaintiffs' fundamental right of political participation...." In short, plaintiffs urge us to rely only on the equal protection arguments which they have relied on, and that the trial court's ruling should be construed to have done the same.

Before turning to the merits, we first set forth the applicable standard of review which governs our decision.

## II

■ "The grant or denial of a preliminary injunction is a decision which lies within the sound discretion of the trial court." *Rathke,* 648 P.2d at 653. Consequently, an appellate court reviewing the issuance of a preliminary injunction will usually do so with great deference to the conclusion reached by the lower court. Only if the lower court's ruling was manifestly unreasonable, arbitrary, or unfair will an appellate court ordinarily substitute its judgment for that of the lower court. *People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987). Where the issue under review on appeal concerns only legal, as opposed to factual, questions however, the lower court's judgment is subject to independent review on appeal. *See Bloomer v. Board of County Comm'rs of Boulder County,* 799 P.2d 942, 944 (Colo.1990) (appellate courts need not defer to trial courts when reviewing questions of law).

---

**5.** The trial court cited *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) and *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), as the primary support for this conclusion. The court quoted the Supreme Court's statement in *Palmore* that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect," *Palmore,* 466 U.S. at 433, 104 S.Ct. at 1882, and stated that *Reitman* stood for the proposition that it was unconstitutional to

take "private discrimination and ... [give] state support to it."

**6.** We note that this presumption is all the more forceful in the context of a constitutional amendment. This is the case not only because here we deal with a constitutional provision as opposed to a statute, but in recognition of the broad powers which our state constitution places in the people. *See supra* note 1.

The question before us is whether the trial court properly determined that the threshold requirement of *Rathke v. MacFarlane*, 648 P.2d 648 (Colo.1987), had been met by plaintiffs. Since that requirement pertains only to whether an existing constitutional right is infringed by Amendment 2, the question we review is strictly a question of law. *Lafferty v. Cook*, 949 F.2d 1546, 1550 (10th Cir.1991) (constitutional standard is a question of law subject to *de novo* review on appeal), *cert. denied*, — U.S. ——, 112 S.Ct.1942, 118 L.Ed.2d 548 (1992). Consequently, we independently review the question of whether Amendment 2 has been shown to violate an existing constitutional right.[7]

### III

It is important to stress at the outset that the Equal Protection Clause of the United States Constitution applies to all citizens, and not simply those who are members of traditionally "suspect" classes such as racial or ethnic minorities. *See Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). That gay men, lesbians, and bisexuals have not been found to constitute a suspect class, *see, e.g., High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990) (homosexuals neither a suspect nor quasi-suspect class); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989) (same), *cert. denied sub nom. Ben–Shalom v. Stone*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir.1989) (same), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990), and that plaintiffs do not claim that they constitute such a class do not render the Equal Protection Clause inapplicable to them.

It is well settled that there are three standards which may be applicable in reviewing an equal protection challenge: strict scrutiny, intermediate scrutiny, and rational basis review. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254 (citations omitted).

Strict scrutiny review—the most exacting standard of review under the Equal Protection Clause—is reserved for statutes or state constitutional amendments that discriminate against members of traditionally suspect classes, *see, e.g., Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971) (alienage); *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (race); *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) (national ancestry and ethnic origin), or infringe on any fundamental constitutional right, *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. Laws that are subject to strict scrutiny review will be sustained only if they are supported by a compelling state interest and narrowly drawn to achieve that interest in the least restrictive manner possible. *Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

Intermediate review, which requires a showing that the law in question is substantially related to a sufficiently impor-

---

7. It is important to note in this context that the parties agree that in reviewing the order of the trial court, we are not limited to assessing only the right identified and relied on by the trial court in reaching its conclusion. Rather, a party "may defend the judgment of the trial court ... on any ground supported by the record, so long as the party's rights are not increased under the judgment." *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 428 (Colo.1991). As noted above, the plaintiffs have presented the same arguments to this court as those made to, but not relied on, by the trial court.

tant governmental interest, *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982), has been applied in the context of laws which draw distinctions based on gender, *id.* at 723–24, 102 S.Ct. at 3335–36, and illegitimacy, *Lalli v. Lalli,* 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978), but not to those laws which create differential treatment based on age, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976).

Thus, in reviewing the trial court's determination that the plaintiffs carried their burden of establishing the threshold requirement of *Rathke v. MacFarlane,* 648 P.2d 648 (Colo.1982), we first must determine which standard applies and second, whether Amendment 2 can be shown, under that standard, and to a reasonable degree of probability, to violate the guarantee of equal protection of the laws.

## A

■ The right of citizens to participate in the process of government is a core democratic value which has been recognized from the very inception of our Republic up to the present time. *See* John Hart Ely, *Democracy and Distrust* 87 (1980) (the Constitution "is overwhelmingly concerned, on the one hand, with procedural fairness in the resolution of individual disputes (process writ small), and on the other, with ... process writ large—with ensuring broad participation in the processes and distributions of government"); Note, *Developments in the Law: Elections,* 88 Harv.L.Rev. 1111, 1114 (1975) ("no institution is more central to the United States'

system of representative democracy than the election").[8]

The value placed on the ability of individuals to participate in the political process has manifested itself in numerous equal protection cases decided by the Supreme Court over the last thirty years. These include the reapportionment cases, *see, e.g., Lucas v. Forty–Fourth Gen. Assembly of Colo.,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), cases concerning minority party rights, *see, e.g., Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), cases involving direct restrictions on the exercise of the franchise, *see, e.g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), and cases involving attempts to limit the ability of certain groups to have desired legislation implemented through the normal political processes, *see, e.g., Washington v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971); and *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). When considered together, these cases demonstrate that the Equal Protection Clause guarantees the fundamental right to participate equally in the political process and that any attempt to infringe on an independently identifiable group's ability to exercise that right is subject to strict judicial scrutiny.[9] *See Dunn v. Blum-*

---

**8.** Indeed, the significance of political participation is evidenced by the fact that nearly half the amendments to the Constitution adopted since 1791 have concerned the franchise and election procedures. *See* U.S. Const. amends. XII (prescribing the method of electing the President and Vice President), XV (prohibiting the denial of the franchise on the basis of race, color, or previous condition of servitude), XVII (providing for the right to vote directly for United States Senators), XIX (extending the franchise to women), XXIII (extending the franchise to residents of the District of Columbia), XXIV

(abolishing the poll tax), XXVI (extending the franchise to 18–year–olds).

**9.** Strict judicial scrutiny is warranted when participatory rights are infringed not only because a *fundamental* right is at stake, *see Kramer,* 395 U.S. at 626–29, 89 S.Ct. at 1889–90, but also because

[t]he presumption of constitutionality and the approval given "rational" classifications in other types of enactments[ ] are based on an assumption that the institutions of state government are structured so as to represent fair-

*stein,* 405 U.S. at 336, 92 S.Ct. at 1000 ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). *See also,* Laurence H. Tribe, *American Constitutional Law* 1062 (2d ed. 1988) ("At their core, all voting-related rights are rights to participate in [the] process [of representative government], and the import of the process for our system of government freights them with their indisputable moment.").

The Supreme Court has consistently struck down legislation which establishes preconditions on the exercise of the franchise. These cases, generally speaking, are the types which most clearly violate the guarantee of equal protection because the legislation under review has the effect of directly "[f]encing out," *Carrington v. Rash,* 380 U.S. 89, 94, 85 S.Ct. 775, 779, 13 L.Ed.2d 675 (1965), certain classes of voters. Thus, the Court has held that the requirement that voters pay a poll tax, *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), be civilians, *Carrington,* or have property or children, *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), before they can exercise the right to vote runs afoul of the Equal Protection Clause. In reviewing this sort of legislative restriction on the franchise, the Court in *Kramer* expressed the standard of review and rationale for applying that standard in the following terms:

> Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives. Therefore, if a challenged state statute grants the right to vote to some

bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.

*Kramer,* 395 U.S. at 626–27, 89 S.Ct. at 1889–90.

As *Kramer* clearly demonstrates, the danger presented by such restrictive legislation is that it may deny "any effective voice in the governmental affairs which substantially affect their lives." *Id.* at 627, 89 S.Ct. at 1889. Thus, to the extent that legislation impairs a group's ability to effectively participate (which is not to be confused with successful participation) in the process by which government operates, close judicial scrutiny is necessitated.

This same emphasis on the value of equal participation emerges from a second group of cases which addresses the issue of reapportionment. In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), for example, the Court acknowledged the importance of political participation and the need for the most searching standard of judicial scrutiny when any effort is made to limit participation, in recognition of the fact that "since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Id.* at 562, 84 S.Ct. at 1381. *See Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964) ("even the most basic [rights], are illusory if the right to vote is undermined").

Unlike the situations presented in *Carrington, Kramer,* and *Harper,* however, the *Reynolds* Court was not confronted with legislation which set a precondition on the right to vote—no individual or group

---

ly all the people. However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality.

*Id.* at 628, 89 S.Ct. at 1890. *See also Reynolds v. Sims,* 377 U.S. 533, 565, 84 S.Ct. 1362, 1383, 12 L.Ed.2d 506 (1964). That is, the ordinary assumption which informs judicial review of legis-

lation that "even improvident decisions will eventually be rectified by the democratic process[ ] and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted," *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979), is rendered inapplicable when participatory rights are at issue.

was precluded, or even impeded, from voting. Rather, the question presented in *Reynolds* concerned the Equal Protection Clause's bearing on participatory effectiveness, *i.e.*, the right to have one's vote be as meaningful as the votes of others.[10] Consequently, the Court's opinion in *Reynolds*, as well as in the other reapportionment cases, reflects the judgment that dilution in the effectiveness of certain voters' exercise of the franchise violates the guarantee of equal protection of the laws not simply because citizens are guaranteed the right to vote, but because that right must be preserved in a meaningful, effective manner. *Reynolds*, 377 U.S. at 565, 84 S.Ct. at 1383 ("each and every citizen has an inalienable right to full and effective participation in the political processes ..."); *Board of Estimate of N.Y. v. Morris*, 489 U.S. 688, 693, 109 S.Ct. 1433, 1438, 103 L.Ed.2d 717 (1989) (same). In short, equal protection requires that voters are able to exercise the right of franchise on an even footing with others. *See Gray v. Sanders*, 372 U.S. 368, 379–80, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963) ("The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications.").

This principle has also been consistently relied on to strike down legislation in a third category of political participation cases—the "candidate eligibility" cases. For example, the Supreme Court in *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), reviewed a series of Ohio statutes which "made it virtually impossible," for new political parties with widespread support, or an old party which

enjoyed very little support, to be placed on the state ballot to choose electors pledged to particular candidates for the Presidency and Vice Presidency of the United States. *Id.* at 24, 89 S.Ct. at 7. The Court observed that the state statutes placed significant burdens on "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," because a "vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot."[11] *Id.* at 31, 89 S.Ct. at 11. The Court, again applying the strict scrutiny standard of review, concluded that only a compelling interest could justify "imposing such heavy burdens on the right to vote and to associate," and held that Ohio had failed to make such a showing. *Id.*

Similarly, in *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), Illinois statutes that discriminated against minority parties in local elections were held invalid under the Equal Protection Clause.[12] Applying the strict scrutiny standard, the Court invalidated the Illinois laws, holding that they unnecessarily restricted a constitutionally protected liberty, even while acknowledging that States have a legitimate interest in regulating the number of candidates that appear on a ballot.

The "precondition," reapportionment, and "candidate eligibility" cases are not dispositive of, or directly controlling on, our decision here, as Amendment 2 falls within none of those three categories of cases. Admittedly, those decisions addressed entirely distinct questions and constitutional problems from those presented here. Nevertheless, it would be erroneous

---

10. In *Reynolds* the Supreme Court held that under the Equal Protection Clause, "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* 377 U.S. at 579, 84 S.Ct. at 1390. The Court required *"substantial* equality" in recognition of the fact "that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." *Id.* at 577, 84 S.Ct. at 1390.

11. The Court also held that the Ohio laws burdened "the right of individuals to associate for the advancement of political beliefs...." *Rhodes*, 393 U.S. at 30, 89 S.Ct. at 10.

12. The Illinois statutes in question drew a distinction between the requisite number of signatures by eligible voters needed to place an independent candidate or a new party on the ballot at the state level from the number required to do so at the local level.

to conclude that those decisions are entirely inapposite. In the course of invalidating the laws at issue in those cases, the Court consistently recognized the paramount importance of political participation in our system of government,[13] and articulated the fundamental principle which guided its decision in those cases: The Equal Protection Clause guarantees the fundamental right to participate equally in the political process and thus, any attempt to infringe on that right must be subject to strict scrutiny and can be held constitutionally valid only if supported by a compelling state interest. This principle is what unifies the cases, in spite of the different factual and legal circumstances presented in each of them. Thus, while all three categories of cases are distinguishable from the present controversy, the common thread which unites them with one another, and with the case before us, is the principle that laws may not create unequal burdens on identifiable groups with respect to the right to participate in the political process absent a compelling state interest.

This principle has received its most explicit, and nuanced, articulation in yet another category of cases where the legislation at issue bore a much closer resemblance to the question presented by Amendment 2. This category of cases involves legislation which prevented the normal political institutions and processes from enacting particular legislation desired by an identifiable group of voters. In each

case, the legislation was held to be violative of equal protection.

In *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Supreme Court struck down a charter amendment enacted by the voters of Akron, Ohio, which required any fair housing ordinance to be approved by the electorate, whereas other ordinances could be enacted by the city council. The Court held that the Akron amendment deprived minority groups of equal protection because it "place[d] special burdens on racial minorities within the governmental process." *Hunter*, 393 U.S. at 391, 89 S.Ct. at 560–61.

In reaching this conclusion, the Court recognized that the amendment was aimed at minority racial groups.[14] However, its opinion speaks to concerns which are broader than the repugnancy of racial discrimination alone. Thus, Justice White, speaking for the Court, noted that Akron was free to require a plebiscite as to "all its municipal legislation," but having chosen to do otherwise, he concluded that Akron could

> no more disadvantage *any particular group* by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size.

*Id.* at 393, 89 S.Ct. at 561 (emphasis added). It is significant to note that in support of this proposition, the Court did not rely on any precedent dealing with racial minorities in the context of voting but instead, cited

13. Indeed, in *Illinois State Board of Elections,* 440 U.S. at 184, 99 S.Ct. at 990, Justice Marshall, speaking for the Court, stated that "for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure." (citing *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964); *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964)).

14. The *Hunter* Court noted that "[h]ere ... there was an explicitly racial classification treating racial housing matters differently from other racial and housing matters," *Hunter,* 393 U.S. at 389, 89 S.Ct. at 560, and observed that "[b]ut for those who sought protection against racial bias,

the approval of the City Council was not enough." *Id.* at 390, 89 S.Ct. at 560. The Court acknowledged, however, that "[i]t is true that the section draws no distinctions among racial and religious groups. Negroes and whites, Jews and Catholics are all subject to the same requirements if there is housing discrimination against them which they wish to end," *id.,* yet the Court also noted that the Akron amendment "nevertheless disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who would bar other discriminations or who would otherwise regulate the real estate market in their favor." *Id.* at 391, 89 S.Ct. at 560. Thus, the Court concluded that while the amendment was facially neutral, "the reality is that the law's impact falls on the minority." *Id.*

*Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), neither of which had anything to do with discrimination against racial, or any other traditionally suspect class of persons.

It is also notable that Justices Harlan and Stewart, both of whom dissented in *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967),[15] concurred separately to the majority opinion in *Hunter.* After articulating their disagreement with the *Reitman* Court, they observed that, unlike the California initiative, "the City of Akron [had] not attempted to allocate governmental power on the basis of any general principle." *Hunter,* 393 U.S. at 395, 89 S.Ct. at 563 (Harlan, J., concurring).[16] To the contrary, the fair housing statute was passed with the "clear purpose of making it more difficult for certain racial and religious minorities to achieve legislation that [was] in their interest." *Id.* This, the concurring Justices concluded, violated the Equal Protection Clause.

*Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), presents another situation in which an issue important to a minority group was removed from consideration via the normal political process. In *Washington,* the Court considered the constitutionality of an initiative which attempted to prohibit local school districts from utilizing mandatory busing as a means of achieving desegregation.[17] Relying on *Hunter,* the Court held that the voters, in passing Initiative 350, had impermissibly interfered with the political process and unlawfully burdened the efforts of minority groups to secure public benefits. *Washington,* 458 U.S. at 467–70, 102 S.Ct. at 3193–95.

In reaching this conclusion, the Court embraced Justice Harlan's "neutral principles" formulation in *Hunter* and referred to it as the "simple but central principle," *id.* at 469, 102 S.Ct. at 3194, underlying the majority opinion in *Hunter.* More specifically, the Court held that the Fourteenth Amendment reaches political structures that "distort[ ] governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." *Id.* at 467, 102 S.Ct. at 3193. It also stated that "laws structuring political institutions or allocating politi-

**15.** In *Reitman,* the Supreme Court invalidated an amendment to the California Constitution which had been passed by the initiative process. "Proposition 14" protected property owners' right to discriminate, on any grounds, in the sale or rental of their real property. The immediate effect of the amendment was to repeal existing state prohibitions on racial discrimination in housing and to prohibit the passage of similar measures in the future. *Reitman,* 387 U.S. at 374, 87 S.Ct. at 1630.

The Supreme Court held that Proposition 14 violated the Equal Protection Clause because it rendered "[t]he right to discriminate, including the right to discriminate on racial grounds ... immune from legislative, executive, or judicial regulation at any level of the state government." *Id.* at 377, 87 S.Ct. at 1632.

**16.** Justices Harlan and Stewart elaborated on the "general principle" theme as follows:

The existence of a bicameral legislature or an executive veto may on occasion make it more difficult for minorities to achieve favorable legislation; nevertheless, they may not be attacked on equal protection grounds since they are founded on neutral principles. Similarly, the rule which makes it relatively difficult to amend a state constitution is commonly justified on the theory that constitutional provi-

sions should be more thoroughly scrutinized and more soberly considered than are simple statutory enactments. Here, too, Negroes may stand to gain by the rule if a fair housing law is made part of the constitution, or they may lose if the constitution adopts a position of strict neutrality on the question. But even if Negroes are obliged to undertake the arduous task of amending the state constitution, they are not thereby denied equal protection. For the rule making constitutional amendment difficult is grounded in neutral principle.

*Hunter,* 393 U.S. at 394–95, 89 S.Ct. at 562–63 (Harlan, J., concurring) (citation omitted).

**17.** Prior to the passage of Initiative 350, which prohibited school boards from requiring any student to attend a school other than the one geographically nearest or next nearest to his home (and set forth a number of exceptions to this rule), *see Washington,* 458 U.S. at 462–63, 102 S.Ct. at 3190–91, "the power to determine what programs would most appropriately fill a school district's educational needs—including programs involving student assignment and desegregation—was firmly committed to the local board's discretion." *Id.* at 479–80, 102 S.Ct. at 3200.

cal power according to 'neutral principles' ... are not subject to equal protection attack.... Because such laws make it more difficult for *every* group in the community to enact comparable laws, they 'provid[e] a just framework within which the diverse political groups in our society may fairly compete.'" *Id.* at 470, 102 S.Ct. at 3195 (quoting *Hunter v. Erickson,* 393 U.S. 385, 393, 89 S.Ct. 557, 562, 21 L.Ed.2d 616 (1969)). In contrast, the initiative at issue in *Washington* did "not attemp[t] to allocate governmental power on the basis of any general principle," *id.* 458 U.S. at 470, 102 S.Ct. at 3195 (quoting *Hunter,* 393 U.S. at 395, 89 S.Ct. at 562 (Harlan, J., concurring)), but rather, used "the racial nature of an issue to define the governmental decisionmaking structure, and thus impose[d] substantial and unique burdens on racial minorities." *Id.*

Thus, while *Washington,* like *Hunter,* involved an initiative that affected a racial minority, and while this fact weighed heavily in the Court's consideration of this case, it would be erroneous to conclude that the "neutral principle" precept is applicable only in the context of racial discrimination. Indeed, such a reading of *Hunter* and *Washington* would be antithetical to the neutral principle itself, for the requirement of neutrality would in fact only be a requirement of nondiscrimination with respect to racial minorities—and not at all a requirement that legislation must "attemp[t] to allocate governmental power on the basis of any general principle." *Id.* 458

U.S. at 470, 102 S.Ct. at 3195 (quoting *Hunter,* 393 U.S. at 395, 89 S.Ct. at 562 (Harlan, J., concurring)). Thus, while *Hunter* and *Washington* are indeed cases which involved racial minorities, the principle articulated in those cases clearly is not one that can logically be limited to the "race" context alone.[18]

This was made clear in *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). In *Gordon,* the Court upheld a West Virginia statute that required approval by a 60% majority of any proposed increase in bond indebtedness or state tax rates. Plaintiffs, a group of individuals who had voted in favor of two proposals covered by the 60% requirement, sought a declaratory judgment that the 60% requirement was unconstitutional under the Equal Protection Clause.[19]

The Supreme Court, in reversing the West Virginia Supreme Court of Appeals, turned its attention to the applicability of *Hunter.* The Court distinguished *Hunter* on the grounds that, unlike the West Virginia statute, which "applie[d] equally to all bond issues for any purpose, whether for schools, sewers, or highways," the municipal ordinance in *Hunter* subjected "fair housing legislation alone ... to an automatic referendum requirement." *Gordon,* 403 U.S. at 5, 91 S.Ct. at 1892. Furthermore, unlike *Hunter,* where "[t]he class singled out ... was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations,'" the

---

**18.** In *Citizens for Responsible Behavior v. Superior Court,* 1 Cal.App.4th 1013, 2 Cal.Rptr.2d 648, 655 (1991), the court, in reviewing a proposed ballot initiative whereunder "persons seeking protective legislation against discrimination based on sexual orientation or AIDS must attempt to persuade a majority of the voters that such an ordinance is desirable," concluded that:

Precisely this arrangement was condemned in *Hunter v. Erickson* ... in which the court invalidated an ordinance which similarly required voter approval for any ordinance prohibiting housing discrimination on the basis of race, religion, or ancestry.

The court held that such an ordinance drew an impermissible "distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate

and those who sought to regulate real property transactions in the pursuit of other ends".... Although the ordinance did not focus on members of minority groups, the court observed that "the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination...."

**19.** One proposal called for the issuance of general obligation bonds for the purpose of building a new school and improving existing educational facilities. The second proposal authorized the Board of Education to levy additional taxes to support current expenditures and capital improvements. *Gordon,* 403 U.S. at 3, 91 S.Ct. at 1890. Of the votes cast, 51.55% favored the bond issue and 51.51% favored the tax levy. *Id.*

Court was unable to discern any "independently identifiable group or category that favors bonded indebtedness over other forms of financing." *Id.* at 5, 91 S.Ct. at 1892. Thus, the Court concluded, "no sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote." *Id.* (citation omitted).

The significance of the *Gordon* Court's discussion of *Hunter* is twofold. First, it is meaningful that the issue in *Gordon* had nothing to do with racial minorities or any other traditionally suspect class, yet the Court felt compelled to discuss *Hunter*. In the course of that discussion, no mention was made of the fact that the West Virginia law was racially neutral, whereas the Akron law clearly was not. If, as the defendants suggest here, *Hunter* is a "race" case and nothing more, the Supreme Court could have summarily dismissed the notion that it was applicable in *Gordon*. The fact that the Court did not do so, however, strongly suggests that the holding of *Hunter* cannot be limited in application only to the review of legislation which discriminates on the basis of race.

Second, although the *Gordon* Court recognized that the Akron law singled out those who would benefit from laws barring racial, religious, or ancestral discrimination, no significance was placed on the nature of the class discriminated against in *Hunter*. Rather, the salient aspect of *Hunter* which distinguished it from the situation presented in *Gordon* was the absence of a group of voters that was "independently identifiable" apart from the group created by the statute itself.[20]

When taken together, these facts clearly support the conclusion that *Hunter* applies to a broad spectrum of discriminatory legislation. This becomes abundantly clear in light of the *Gordon* Court's articulation of the controlling constitutional standard: "We conclude that so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause." *Gordon*, 403 U.S. at 7, 91 S.Ct. at 1892.[21]

### B

We conclude that the Equal Protection Clause of the United States Constitution protects the fundamental right to participate equally in the political process, and that any legislation or state constitutional amendment which infringes on this right by "fencing out" an independently identifiable class of persons must be subject to strict judicial scrutiny.[22]

---

**20.** In *Town of Lockport, N.Y. v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 268 n. 13, 97 S.Ct. 1047, 1053 n. 13, 51 L.Ed.2d 313 (1977), the Court cited *Gordon* and *Hunter* as support for the proposition that "a referendum voting scheme that can be characterized in mathematical terms as giving disproportionate power to a minority does not violate the Equal Protection Clause, there being no discrimination against an identifiable class."

**21.** In so concluding, we are mindful that a majority of the Supreme Court in *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), upheld the constitutionality of a California constitutional amendment that required majority approval in a community election for the construction of any low-rent housing project. The Court held that the mandatory referendum procedure, which was not limited to proposals for low-cost public housing, ensured democratic decisionmaking and did not violate the Equal Protection Clause. In reaching this conclusion, the Court declined to "extend" *Hunter* to a provision which was not "aimed at a racial minority." *James*, 402 U.S. at 141, 91 S.Ct. at 1333.

Three Justices dissented, not by taking issue with the majority's use of *Hunter*, but on the basis that the provision should be invalidated on the grounds that poverty is a suspect classification. It is significant to note that all of the Justices who joined in the majority opinion in *James* also joined the later opinion in *Gordon* (as did Justice Douglas who did not participate in *James*), which itself made no reference to *James*. The two Justices who dissented in *Gordon* (Justices Brennan and Marshall) did not do so on the basis of the majority's application of *Hunter*.

Thus, we are of the opinion that *James* is best understood as a case declining to apply suspect class status to the poor, and not as a limitation on *Hunter*.

**22.** Professor Michelman characterizes the Supreme Court's jurisprudence in the participation cases as establishing that,

by force of the equal protection clause, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," ...

We reject defendants' contention that Amendment 2 cannot be understood to infringe on any recognized right protected under the Equal Protection Clause. We do so for a number of reasons. First, defendants urge that the authority relied on in reaching our conclusion, when "properly analyzed," recognizes a cognizable equal protection claim "only when the political process has been restructured to place unusual burdens upon racial groups, or, in the most expansive sense, [upon politically powerless groups]." This contention belies the fact that much of the authority relied on in reaching our conclusion did not involve racial groups.[23]

Moreover, as *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), makes clear, and the language of *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), itself indicates, the principle that a "State may no more disadvantage any particular group by making it more difficult to enact legislation on its behalf than it may dilute any person's vote or give any groups smaller representation than another of comparable size," *Hunter*, 393 U.S. at 393, 89 S.Ct. at 561, does not apply simply to racial minorities.

Finally, if the cases referred to above were decided solely on the basis of the "suspect" nature of the classes involved, there would have been no need for the Court to consistently express the paramount importance of political participation or to subject legislation which infringed on the right to participate equally in the political process to strict judicial scrutiny. To the contrary, were these simply "race cases," the Supreme Court would have been required to do nothing more than note that the legislation at issue drew a classification that was inherently suspect (*i.e.,*

that discriminated on the basis of race), and apply strict scrutiny to resolve those cases—irrespective of the right, entitlement, or opportunity that was being restricted. *Compare Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 628 n. 9, 89 S.Ct. 1886, 1890 n. 9, 23 L.Ed.2d 583 (1969) ("we have long held that if the basis of classification is inherently suspect, such as race, the statute must be subjected to an exacting scrutiny, regardless of the subject matter of the legislation") *with Graham v. Richardson*, 403 U.S. 365, 375, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971) ("It is enough to say that the classification involved in *Shapiro [v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)] was subjected to strict scrutiny under the compelling state interest test, not because it was based on any suspect criterion such as race, nationality, or alienage, but because it impinged upon the fundamental right of interstate movement.").

We similarly reject defendants' contention that the right of equal political participation "can only work when applied to suspect classifications ... [for any broader application will] necessarily mandate[ ] that all legal and policy choices be made at the lowest governmental level possible." This argument is based on defendants' observation that the Colorado Constitution creates numerous burdens which, in order to be overcome, require a constitutional amendment, such as article XVIII, section 9, (permitting limited gaming only in Central City, Blackhawk, and Cripple Creek) and article XIX, section 2, (prohibiting the General Assembly from proposing amendments to more than six articles of the state constitution at the same session).

---

[T]hat this right is among those it classes as "fundamental," ... so that any restriction of it "must be carefully and meticulously scrutinized," ... to determine whether it is "necessary to promote a compelling state interest." Frank I. Michelman, *Conceptions of Democracy in American Constitutional Argument: Voting Rights*, 41 Fla.L.Rev. 443, 459 n. 63 (1989).

**23.** *See, e.g., Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Dunn v. Blumstein,*

405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

While defendants are correct in observing that there are constitutional provisions which create some barriers to those who might seek governmental action in conflict with these provisions, it cannot be said that the provisions cited by defendants isolate any "independently identifiable group," *Gordon v. Lance,* 403 U.S. 1, 5, 91 S.Ct. 1889, 1892, 29 L.Ed.2d 273 (1971), from pursuing its political objectives. In fact, the precise argument defendants now advance was expressly rejected by the Supreme Court in *Gordon.* As noted above, the constitution and statutes at issue in *Gordon* required a 60% majority before certain bonds or tax levies could be passed. The Court, in refusing to apply the principle of *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), under the facts of *Gordon,* noted that "[i]n contrast [to the class singled out in *Hunter*] we can discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote." *Gordon,* 403 U.S. at 5, 91 S.Ct. at 1892 (citation omitted). We find this reasoning both controlling and persuasive here. The same cannot be said, however, of Amendment 2.[24]

We therefore conclude that defendants' argument that the right to participate equally in the political process applies only to traditionally suspect classes is without merit. Similarly, we reject their argument that the above cited authorities are properly understood only as "suspect class" cases, and not "fundamental rights" cases.

We turn, therefore, to the question of whether Amendment 2 has been shown, to a reasonable degree of probability, to infringe on the fundamental right to participate equally in the political process beyond a reasonable doubt.

## IV

■ In reviewing Amendment 2, we do so in light of its immediate objective, its ultimate effect, its historical context, and the conditions existing prior to its enactment. *Reitman v. Mulkey,* 387 U.S. 369, 373, 87 S.Ct. 1627, 1629, 18 L.Ed.2d 830 (1967).

The immediate objective of Amendment 2 is, at a minimum,[25] to repeal existing statutes, regulations, ordinances, and policies of state and local entities that barred discrimination based on sexual orientation. *See* Aspen, Colo., Mun.Code § 13–98 (1977) (prohibiting discrimination in employment, housing and public accommodations on the basis of sexual orientation); Boulder, Colo., Rev.Code §§ 12–1–2 to –4 (1987) (same); Denver, Colo., Rev.Mun.Code art. IV, §§ 28–91 to –116 (1991) (same); Executive Order No. D0035 (December 10, 1990) (prohibiting employment discrimination for "all state employees, classified and exempt" on the basis of sexual orientation); Colorado Insurance Code, § 10–3–1104, 4A C.R.S. (1992 Supp.) (forbidding health insurance providers from determining insurability and premiums based on an applicant's, a beneficiary's, or an insured's sexual orientation); and various provisions prohibiting

---

**24.** *See infra* at 1284–1286.

**25.** The parties sharply disagree on the scope of Amendment 2's provisions. For example, defendants argue that Amendment 2 "does not prevent the enforcement of rights derived from other sources including federal law; it allows enforcement of rights from private contracts; and does not prevent private companies [from adopting policies prohibiting discrimination based on sexual orientation]," and conclude that Amendment 2 "prohibits only the recognition or enforcement of state or locally created civil rights protections above and beyond those required by federal law." Plaintiffs, in contrast,

argue that "defendants' interpretation bears little resemblance to the language of Amendment 2," and conclude that, on its face, the amendment clearly limits the sort of redress that defendants argue it does not.

The precise scope of Amendment 2 need not be determined here, however, because neither the parties, nor their amici, have contended that Amendment 2 does not prohibit the enactment of antidiscrimination laws by state or local entities. Since all agree that Amendment 2 unambiguously attempts to do this, and since that restriction alone provides a sufficient basis for our conclusion, we need not determine what broader application Amendment 2 might have.

discrimination based on sexual orientation at state colleges.[26]

The "ultimate effect"[27] of Amendment 2 is to prohibit any governmental entity from adopting similar, or more protective statutes, regulations, ordinances, or policies in the future unless the state constitution is first amended to permit such measures. In the absence of such a constitutional amendment, any governmental entity would be acting contrary to the state constitution by "adopting, enacting, or enforcing" any such measure.

Thus, the right to participate equally in the political process is clearly affected by Amendment 2, because it bars gay men, lesbians, and bisexuals from having an effective voice in governmental affairs insofar as those persons deem it beneficial to seek legislation that would protect them from discrimination based on their sexual orientation. Amendment 2 alters the political process so that a targeted class is prohibited from obtaining legislative, executive, and judicial protection or redress from discrimination absent the consent of a majority of the electorate through the adoption of a constitutional amendment. Rather than attempting to withdraw antidiscrimination issues as a whole from state and local control, Amendment 2 singles out one form of discrimination and removes its redress from consideration by the normal political processes.

Amendment 2 expressly fences out an independently identifiable group. Like the laws that were invalidated in *Hunter*, which singled out the class of persons "who would benefit from laws barring racial, religious, or ancestral discrimina-

tions," *Hunter*, 393 U.S. at 391, 89 S.Ct. at 560, Amendment 2 singles out that class of persons (namely gay men, lesbians, and bisexuals) who would benefit from laws barring discrimination on the basis of sexual orientation. No other identifiable group faces such a burden—no other group's ability to participate in the political process is restricted and encumbered in a like manner. Such a structuring of the political process undoubtedly is contrary to the notion that "[t]he concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications." *Gray v. Sanders*, 372 U.S. 368, 379–80, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963).

In short, gay men, lesbians, and bisexuals are left out of the political process through the denial of having an "effective voice in the governmental affairs which substantially affect their lives." *Kramer*, 395 U.S. at 627, 89 S.Ct. at 1889. Strict scrutiny is thus required because the normal political processes no longer operate to protect these persons. Rather, they, and they alone, must amend the state constitution in order to seek legislation which is beneficial to them. By constitutionalizing the prescription that no branch or department, nor any agency or political subdivision of the state "shall enact, adopt, or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation ... shall constitute or otherwise be the basis of ... [a] claim of discrimination," Amendment 2 singles out and prohibits this class of persons from seeking governmental action favorable to it and thus, from participating equally in the political process.[28]

---

**26.** Metropolitan State College of Denver prohibits college sponsored social clubs from discriminating in membership on the basis of sexual orientation and Colorado State University has an antidiscrimination policy which encompasses sexual orientation. *See* Legislative Council of the Colorado General Assembly, An Analysis of 1992 Ballot Proposals (Research Publ. No. 369, p. 10, 1992).

**27.** *See supra* note 25.

**28.** As for the State's contention that "[t]he plaintiffs continue to have the ability to participate fully in all of Colorado's political processes;

what they do not have is a right to *successful* participation in the process," we think this misconstrues the nature of plaintiffs' participatory rights. While the State is quite right that the plaintiff class, like any other members of society, has no right to successful participation in the political process, the fact remains that its unsuccessful participation is mandated by the provisions of Amendment 2. In contrast to all other members of the electorate whose successful or unsuccessful participation in the process cannot be determined until ballots, votes, charters, etc., have been counted or voted upon, with the exception of a state constitutional amend-

Prior to the passage of this amendment, gay men, lesbians, and bisexuals were, of course, free to appeal to state and local government for protection against discrimination based on their sexual orientation.[29] Thus, like any other members of the electorate, the political process was open to them to seek legislation or other enactments deemed beneficial in the same way it was open to all others. Were Amendment 2 in force, however, the sole political avenue by which this class could seek such protection would be through the constitutional amendment process. In short, Amendment 2, to a reasonable probability, infringes on a fundamental right protected by the Equal Protection Clause of the United States Constitution. Amendment 2 must be subject to strict judicial scrutiny in order to determine whether it is constitutionally valid under the Equal Protection Clause.

██ Because the defendants and their amici have not proffered any compelling state interest to justify the enactment of Amendment 2 at this stage of the proceedings as required under the strict scrutiny standard of review, *see Plyler v. Doe,* 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982); *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985), we conclude that plaintiffs have met their burden under *Rathke v. MacFarlane,* 648 P.2d 648, 653 (Colo.1982).

## V

██ That Amendment 2 was passed by a majority of voters through the initiative process as an expression of popular will mandates great deference. However, the facts remain that "[o]ne's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote;

they depend on the outcome of no elections," *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943), and that "[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-Fourth Gen. Assembly of Colo.,* 377 U.S. 713, 736, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964).

We reject defendants' argument that the trial court erred in granting a preliminary injunction enjoining defendants from enforcing Amendment 2 pending a trial on the merits of plaintiffs' constitutional challenge.

Order affirmed.

Justice ERICKSON dissents.

Justice ERICKSON dissenting:

I respectfully dissent. This is an appeal of a district court order granting a preliminary injunction that prohibits the Governor and the Attorney General from enforcing a voter-initiated amendment to the Colorado Constitution ("Amendment 2").[1] The issue before us is whether the district court for the City and County of Denver properly concluded that the appellees met the requirements set forth in *Rathke v. MacFarlane,* 648 P.2d 648 (Colo.1982), and C.R.C.P. 65, for the issuance of a preliminary injunction. Because we are reviewing the district court's underlying legal premise for the injunction, we are obligated to apply a de novo standard of review. Based on that standard, I would reverse and discharge the preliminary injunction, and remand for trial on the permanent injunction.

The district court issued the preliminary injunction based on its conclusion that Amendment 2 must be evaluated under the

---

ment, gay men, lesbians, and bisexuals are told that "you can appeal to government on those issues of concern to you, but you will, by virtue of Amendment 2, lose—irrespective of your ability to summon the support of others, or carry a majority in an election."

**29.** Indeed, this class of persons had done precisely this with some measure of success. *See supra* at 1284–1285.

**1.** A state constitutional amendment passed through the initiative process "shall take effect from and after the date of the official declaration of the vote thereon by proclamation of the governor, but not later than thirty days after the vote has been canvassed." *See* Colo. Const. art. V, § 1. The injunction was sought to prevent Amendment 2 from taking effect.

strict scrutiny standard of review. The strict scrutiny standard of review was found to be applicable based on a *fundamental right* "not to have the State endorse and give effect to private biases" with respect to "an identifiable class." The district court's delineation of the fundamental right supporting the preliminary injunction has never been identified or recognized by the United States Supreme Court or by any other court. As such, the district court's recognition of a new fundamental right is based on an underlying legal premise that is erroneous.

The majority upholds the preliminary injunction and agrees that Amendment 2 should be evaluated under the strict scrutiny standard of review. Unlike the district court, however, the majority concludes that strict scrutiny applies based on the recognition of a different *fundamental right,* "the right to participate equally in the political process." Maj. op. at 1276. In my view, based on the United States Supreme Court precedent cited in the majority opinion, the majority's conclusion is also erroneous.

Since I cannot agree that Amendment 2 should be evaluated under the strict scrutiny standard of review based on Supreme Court precedent defining fundamental constitutional rights, I would reverse the district court and discharge the preliminary injunction.

## I

On November 3, 1992, Amendment 2 passed by a margin of 813,966 to 710,151. Amendment 2 provides:

**No Protected Status Based on Homosexual, Lesbian, or Bisexual Orientation.** Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of, or entitle any person or class of persons to have or claim any minority status, quota preferences, protected status or claim of discrimination. This Section of the Constitution shall be in all respects self-executing.

On November 12, 1992, the appellees filed suit to permanently enjoin the enforcement of Amendment 2, alleging that it violated provisions of both the Colorado and United States Constitutions. The appellees claimed, *inter alia,* that Amendment 2 violated (1) the rights to freedom of association and expression under the First Amendment; (2) the fundamental right to petition the government for redress of grievances; (3) the fundamental right to vote; and (4) the fundamental right to participate equally in the political process. After the district court rejected the request of the appellees for an expedited hearing on the merits, they filed motions to preliminarily enjoin the Governor and the Attorney General from enforcing Amendment 2.

The appellees based their motion for a preliminary injunction solely on the United States Constitution, claiming that Amendment 2 violated their First Amendment right to freedom of expression and their Fourteenth Amendment right to equal protection of the laws.[2] In their motion, the appellees did not claim that Amendment 2 violated the Equal Protection Clause because a suspect class was involved.[3] In-

---

**2.** An amendment to the state constitution cannot be unconstitutional, unless and to the extent it violates the United States Constitution. *Cf.* Colo. Const. art. II, § 2; *Cooper Motors, Inc. v. Board of County Comm'rs,* 131 Colo. 78, 84, 279 P.2d 685, 688 (1955) ("[t]he people can do any thing by constitutional amendment unless prohibited by the terms of the Constitution of the United States").

**3.** The majority recognizes that gay men, lesbians, and bisexuals constitute an "identifiable group." Maj. op. at 1284. This conclusion is

true, just as is the fact each of the three groups standing alone constitutes an identifiable group based on the sexual orientation and conduct of gay men, lesbians, and bisexuals. The mere fact that a group can be identified, however, does not mean that the group constitutes a suspect class that receives heightened scrutiny under the Equal Protection Clause. *See, e.g., Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, —— L.Ed.2d —— (1993) (recognizing that the Supreme Court has declined to apply heightened scrutiny to the identifiable groups of the mental-

stead, the appellees based their equal protection argument on an alleged infringement of the fundamental right to participate equally in the political process. The appellees claimed that if the district court concluded that Amendment 2 impinged on either the First or the Fourteenth Amendment, a strict scrutiny standard of review should apply under which the State would have the burden of establishing a compelling state interest.[4]

After conducting a four-day hearing and without making any findings of fact, the district court granted the preliminary injunction. In rendering its decision, the district court agreed that the strict scrutiny standard of review applied to Amendment 2. However, the district court did not rely upon either the First Amendment argument advanced by the appellees or address the fundamental right asserted by the appellees in their motion for the preliminary injunction. Instead, the district court held that Amendment 2 must satisfy the strict scrutiny standard of review based on a fundamental right not to have the State

endorse and give effect to private biases.[5] Pending resolution of this appeal, trial has been set in October 1993, to determine whether a permanent injunction should be issued.

## II

Although this case presents a number of legal questions, it is not necessary or appropriate for this court to determine all of the issues raised before the district court. The sole issue before us on this appeal is the validity of the preliminary injunction issued by the district court. As such, the logical starting point is the district court's order and the reasons for the entry of the preliminary injunction. Neither the majority nor the appellees defend the underlying premise of the district court's order which identified a new fundamental right as the basis for applying the strict scrutiny standard of review. The explanation is simple—the district court erred in issuing a preliminary injunction based on a fundamental right not to have the State endorse

---

ly ill or the mentally retarded); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (declining to apply heightened scrutiny to the identifiable group of elderly individuals).

In fact, courts have consistently rejected claims that the identifiable group of homosexuals constitutes a suspect class. *See, e.g., High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990) (concluding that homosexuals are neither a suspect or quasi-suspect class); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989) (same), *cert. denied sub nom. Ben–Shalom v. Stone*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir.1989) (same), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *Padula v. Webster*, 822 F.2d 97, 103 (D.C.Cir.1987) (same); *National Gay Task Force v. Board of Educ.*, 729 F.2d 1270, 1273 (10th Cir.1984) (same), *aff'd*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985); *Steffan v. Cheney*, 780 F.Supp. 1, 10 (D.D.C.1991) (same).

For example, *Padula* rejected the claim that homosexuals constitute a suspect class by stating that "[i]f the Court [in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)] was unwilling to object to state laws that criminalized the behavior that defines the class, it is hardly open to a lower court to conclude that state-sponsored discrimination against the class is invidious [because] there can

hardly be a more palpable discrimination against a class than making the conduct that defines the class criminal." *Padula*, 822 F.2d at 103. A number of states continue to classify the conduct that defines the class as criminal behavior. *See, e.g.,* Ala.Code § 13A–6–65(a)(3) (1975); Ark.Code Ann. § 5–14–122 (Michie 1987); Ga. Code Ann. § 16–6–2 (1992); Kan.Stat.Ann. § 21–3505 (1988 & 1992 Supp.); Ky.Rev.Stat. Ann. § 510.100 (Michie/Bobbs–Merrill 1990); Md.Code Ann.Crimes and Punishment Art. 27, § 554 (1954); Mich.Stat.Ann. § 28.355 [M.C.L.A. § 750158] (Callaghan 1990); Minn.Stat. § 609.-293 (1992); N.Y.Penal Law § 130.38 (McKinney 1987); Okla.Stat.Ann. tit. 21, § 886 (West 1983 & 1993 Supp.); S.D.Codified Laws Ann. § 22–22–2 (1988 & 1993 Supp.).

4. The appellees alternatively asserted that the burdens Amendment 2 imposed on gay men, lesbians, and bisexuals lacked a rational basis.

5. The appellees assert on appeal that "read in light of the arguments actually presented to the district court, th[e district court's] holding is best construed to mean that Amendment 2 violates the plaintiffs' fundamental right of political participation." As the majority recognizes, this assertion is meritless. *See* maj. op. at 1274. The district court's order simply does not address the fundamental rights argument advanced by the appellees or their First Amendment claim.

and give effect to private biases. Before addressing the district court's order, however, it is necessary to outline the appropriate standard of review on appeal for the issuance of a preliminary injunction.

### A

It is well settled that an appellate court must reverse the granting of a preliminary injunction if the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *Shango v. Jurich*, 681 F.2d 1091, 1096 (7th Cir.1982); *e.g., Wakabayashi v. Tooley*, 648 P.2d 655 (Colo.1982). In *Rathke v. MacFarlane*, 648 P.2d 648 (Colo.1982), we delineated the standard for a trial court to apply in ruling on a preliminary injunction motion. Before a trial court may issue a preliminary injunction under *Rathke*, "the moving party must establish, as a threshold requirement, a clear showing that injunctive relief is necessary to protect existing ... fundamental constitutional rights." *Id.* at 653. Accordingly, to determine whether the threshold requirement of *Rathke* is satisfied, a trial court must analyze whether the United States Supreme Court has recognized the fundamental right at issue. *Id.; cf. Dronenburg v. Zech*, 741 F.2d 1388, 1396 n. 5 (D.C.Cir. 1984) (stating that "the only question open to [a lower court is] whether the Supreme Court has created a right, which, fairly defined, covers the case before [it] or whether the Supreme Court has specified a mode of analysis, a methodology, which, honestly applied, reaches the case [it] must now decide").

The issuance of a preliminary injunction by a trial court must also be guided by sound legal principles. *See Shango*, 681 F.2d at 1096; *Charles v. Carey*, 627 F.2d 772, 776 (7th Cir.1980). When a preliminary injunction is based on an erroneous legal premise, the underlying premise is subject to de novo review by an appellate court, which can determine whether the premise is erroneous. *See Shango*, 681 F.2d at 1096; *Buffalo Courier–Express, Inc. v. Buffalo Evening News*, 601 F.2d 48, 59 (2d Cir.1979); *Douglas v. Beneficial Fin. Co.*, 469 F.2d 453, 454 (9th Cir.1972); *Delaware & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 620 (D.C.Cir.), *cert. denied*, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971); *Quaker Action Group v. Hickel*, 421 F.2d 1111, 1115 (D.C.Cir.1969); *accord Bloomer v. Boulder County Bd. of Comm'rs*, 799 P.2d 942, 944 (Colo.1990). While a determination on appeal that a trial court's underlying legal premise is erroneous does not reflect that the trial court was chargeable with an abuse of discretion, *see Delaware*, 450 F.2d at 620–21, a preliminary injunction predicated on a clear mistake of law may nevertheless require reversal. *Shango*, 681 F.2d at 1096; *Charles*, 627 F.2d at 776; *Delaware*, 450 F.2d at 623.

Based on the foregoing principles, it is appropriate to apply a de novo standard of review in this case to evaluate the district court's underlying legal premise that the Supreme Court has recognized a fundamental right not to have the State endorse and give effect to private biases. A review of Supreme Court jurisprudence concerning fundamental rights is therefore necessary to determine whether the premise relied upon by the district court is erroneous.[6]

### B

Under traditional equal protection analysis, legislation that involves a suspect clas-

---

6. Our review in this case is limited to the United States Constitution. *See supra* note 2 and accompanying text. Accordingly, we are required to follow the pronouncements of the Supreme Court. *People v. Cisneros*, No. 91SC467, 1993 WL 242337, at *9 — P.2d ——, —— (Colo. July 6, 1993) (Erickson, J., concurring) (stating that state courts are bound by Supreme Court precedent interpreting the federal Constitution and cannot impose greater limitations or afford more protections under the federal Constitution than the Supreme Court has in its decisions); *cf. Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 846, 122 L.Ed.2d 180 (1993) (Thomas, J., concurring) (stating that under the structure of our national system, a state court decision interpreting the federal Constitution is no less authoritative than a lower federal court decision).

sification *or* affects a fundamental right is subject to the strict scrutiny standard of review. *Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, —— L.Ed.2d —— (U.S. June 24, 1993); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *see generally* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law Substance and Procedure* § 18.3, at 12–28 (2d ed. 1992 & 1993 Supp.) [hereinafter *Treatise on Constitutional Law* ]. If the government cannot show a compelling state interest, legislation that involves a suspect classification or affects a fundamental right will be declared unconstitutional. *See Heller,* —— U.S. at ——, 113 S.Ct. at 2642; *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254.

Justice Stone's discussion of "discrete and insular minorities" in his renowned footnote 4 of *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), explains the rationale for subjecting legislation involving a suspect classification to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976); *e.g., Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971).[7] Since that time, the Supreme Court has held, without exception, that the strict scrutiny standard of review applies to legislation or state constitutional amendments based on traditionally suspect classifications. *See, e.g., Graham,* 403 U.S. at 372, 91 S.Ct. at 1852 (alienage); *Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (race); *Korematsu v. United States,* 323 U.S. 214, 215, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) (national origin).[8]

Similarly, the Supreme Court has held repeatedly that the strict scrutiny standard of review applies to legislation that affects a "fundamental" constitutional right. The identification of a right as a fundamental right is a substantive decision unrelated to equal protection or the technical standards of review. *See* 3 *Treatise on Constitutional Law* § 18.3, at 18; *see generally* 2 *Treatise on Constitutional Law* § 15.7, at 427–37. The decision of whether a right is fundamental involves a judicial determination that the text or structure of the federal Constitution evidences a value that should be taken from the control of the political branches of government and is best characterized as a substantive due process decision. *See* 3 *Treatise on Constitutional Law* § 18.3, at 18 n. 19; *Bowers v. Hardwick,* 478 U.S. 186, 197, 106 S.Ct. 2841, 2847, 92 L.Ed.2d 140 (1986) (Powell, J., concurring); *see also San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–1297, 36 L.Ed.2d 16 (1973) (suggesting that fundamental rights must be explicitly or implicitly guaranteed by the United States Constitution).

For example, the decision of the Supreme Court to find the right to vote to be a constitutionally protected fundamental right that is subject to the strict scrutiny standard of review was a substantive due process determination based on an analysis of the importance of the right to vote and the provisions of the Constitution. *See* 3 *Treatise on Constitutional Law* § 18.31, at 766. The Supreme Court has employed similar analysis to recognize the fundamental rights of interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22

---

7. Justice Stone explained in footnote 4:

   [W]e need [not] enquire whether similar considerations enter into the review of statutes directed at particular religious, or national, or racial minorities: whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.

   *Carolene Products,* 304 U.S. at 152–53 n. 4, 58 S.Ct. at 783–84 n. 4 (citations omitted).

8. In this case, the appellees did not assert before the district court or on appeal that Amendment 2 should be evaluated under the strict scrutiny standard of review based on suspect class analysis. *See also supra* note 3 (listing courts that have rejected argument that homosexuals constitute a suspect class).

L.Ed.2d 600 (1969), privacy, *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965), and most of the provisions set forth in the Bill of Rights. *See, e.g., Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (using equal protection analysis to strike down a law that infringed upon fundamental rights within the First Amendment).[9]

For the most part, however, the Supreme Court has refused to expand the list of fundamental constitutional rights. The number of rights that the Supreme Court has found to be fundamental, and therefore worthy of strict judicial scrutiny, is quite limited. Among others, the Supreme Court has refused to declare education, housing, welfare payments, or government employment to be of fundamental constitutional value. *See 3 Treatise on Constitutional Law* § 18.42, at 821–31.

*Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), in which the Supreme Court rejected the assertion that the federal Constitution conferred a fundamental right on homosexuals to engage in sodomy, is instructive of the type of analysis used by the High Court to address the substantive due process question of whether a fundamental right exists.

In answering the substantive due process question, Justice White reviewed prior cases addressing fundamental rights:

> Striving to assure itself and the public that announcing rights not readily identifiable in the Constitution's text involves much more than the imposition of the Justices' own choice of values on the States and the Federal Government, the Court has sought to identify the nature of the rights qualifying for heightened judicial protection. In *Palko v. Connecticut,* 302 U.S. 319, 325, 326 [58 S.Ct. 149, 151, 152, 82 L.Ed. 288] (1937), it was said that this category includes those fundamental liberties that are "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [they] were sacrificed." A different description of fundamental liberties appeared in *Moore v. East Cleveland,* 431 U.S. 494, 503 [97 S.Ct. 1932, 1937, 52 L.Ed.2d 531] (1977) (opinion of Powell, J.), where they are characterized as those liberties that are "deeply rooted in this Nation's history and tradition." *Id.,* at 503 [97 S.Ct., at 1938] (Powell, J.). *See also Griswold v. Connecticut,* 381 U.S., at 506 [85 S.Ct., at 1693].
>
> It is obvious to us that neither of these formulations would extend a fundamen-

---

**9.** Under the Due Process Clause of the Fourteenth Amendment, most of the provisions of the Bill of Rights have been applied to the states because the Supreme Court has found them to be "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), or "fundamental to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 148–49, 88 S.Ct. 1444, 1446–48, 20 L.Ed.2d 491, *reh'g denied,* 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968). Today, virtually all of the provisions of the Bill of Rights have been incorporated into the Fourteenth Amendment. *E.g., Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (incorporating Fifth Amendment protection against double jeopardy); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (incorporating Sixth Amendment right to counsel in criminal prosecution); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (incorporating Fourth Amendment regulation against unreasonable search and seizures); *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (incorporating First Amendment free speech protection); *but see Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed.

232 (1884) (refusing to incorporate grand jury indictment guarantee of the Fifth Amendment).

The rights that have been held applicable to the states through the Fourteenth Amendment are also considered fundamental rights for purposes of equal protection analysis. *See 3 Treatise on Constitutional Law* § 18.39, at 490. As Professors Nowak and Rotunda explain:

> [L]aws which classify persons in terms of their abilities to exercise rights which have specific recognition in the first eight amendments do not generally arise as equal protection issues. In these instances the denial of the right to one class of persons is likely to be held a violation of the specific guarantee without any need to resort to equal protection analysis. Thus, if the state or federal government were to deny to a specific class of persons the right to bail upon certain criminal charges, the classification should be analyzed to determine the compatibility of the law with the substantive guarantees of the eighth amendment prohibition of excessive bail, although it could just as easily be analyzed as an equal protection issue.

*Id.* at 490–91.

tal right to homosexuals to engage in acts of consensual sodomy.

*Bowers,* 478 U.S. at 191–92, 106 S.Ct. at 2844–45; *see generally* John E. Nowak, *The "Sixty–Something" Anniversary of the Bill of Rights,* 1992 U.Ill.L.Rev. 445, 462–76 (reviewing different methods of constitutional interpretation).

Having concluded that a fundamental right to engage in homosexual sodomy did not exist, Justice White emphasized that the case also "call[ed] for some judgment about the limits of the Court's role in carrying out its constitutional mandate," *Bowers,* 478 U.S. at 190, 106 S.Ct. at 2843, and stated:

Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution. That this is so was painfully demonstrated by the face-off between the Executive and the Court in 1930's, which resulted in the repudiation of much of the substantive gloss that the Court had placed on the Due Process Clauses of the Fifth and Fourteenth Amendments. *There should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental.* Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us today falls far short of overcoming this resistance.

*Id.* at 194–95, 106 S.Ct. at 2846 (emphasis added). Given the express reluctance of the Supreme Court to recognize "new" fundamental rights, I address the district court's order.

### C

In this case, the district court's underlying legal premise that the Supreme Court has recognized a fundamental right not to have the State endorse and give effect to private biases provided the basis for issuing the preliminary injunction. However, a review of the Supreme Court precedent cited by the district court to justify the issuance of the preliminary injunction leads me to conclude that the Supreme Court has not recognized the fundamental right identified by the district court.

In support of its recognition of a new fundamental right, the district court cited language from *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). The district court also referred to *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and *Pruitt v. Cheney,* 963 F.2d 1160 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581, to bolster its reasoning. Properly analyzed, these cases do not support judicial recognition of a fundamental right not to have the State endorse and give effect to private biases, but rather indicate that the district court extrapolated a fundamental right from the language appearing in the various decisions.

In *Reitman,* the Supreme Court reviewed a voter-initiated state constitutional amendment which the California Supreme Court concluded was intended to encourage and authorize racial discrimination. *Reitman,* 387 U.S. at 376, 87 S.Ct. at 1631. The California Supreme Court found that the intent of the constitutional amendment was to create a constitutional right to discriminate on racial grounds and therefore dealt with the amendment as though it expressly authorized and constitutionalized the private right to discriminate against racial minorities. *Id.* The Supreme Court accepted the findings of the California court and concluded that "there was no sound reason [to] reject [its] judgment" that the amendment involved racial discrimination in violation of the Fourteenth Amendment. *Id.*

Language subsequently appeared in *Reitman* which was seized on by the district court in support of the recognition of

a fundamental right of any identifiable group not to have the state endorse and give effect to private biases. *Reitman* stated:

> The right to discriminate, including the right to discriminate on *racial grounds*, was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government. Those practicing *racial discriminations* need no longer rely solely on their personal choice. They could now invoke express constitutional authority, free from censure or interference of any kind from official sources.

*Id.* at 377, 87 S.Ct. at 1632 (emphasis added). Based on this language from *Reitman,* the district court characterized the analysis of the Supreme Court as involving a fundamental right. The district court's conclusion is erroneous insofar as *Reitman's* equal protection analysis focused solely on the racial classification drawn by the constitutional amendment and represents traditional suspect classification analysis. As such, no court or commentator has ever viewed *Reitman,* either alone or in combination with other cases, as having applied fundamental right analysis.

In *Palmore,* the Supreme Court invalidated a child custody order that had been based solely on a judicial determination that it would be harmful to a child to remain in a racially mixed household. *Palmore,* 466 U.S. at 431, 104 S.Ct. at 1881. *Palmore* struck down the lower court's custody order because it represented invidious racial prejudice. In doing so, *Palmore* explicitly stressed the importance of the racial classification and accordingly concluded that the strict scrutiny standard of review applied. *Id.* at 432–33, 104 S.Ct. at 1881–82 (stating that "classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category. Such classifications are subject to the most exacting scrutiny").

*Palmore* also stated "the Constitution cannot control such prejudices but neither can it tolerate them ... private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* at 433, 106 S.Ct. at 1882. Despite this language, which was cited by the district court in this case, the fact remains that *Palmore* was based on traditional suspect classification analysis and not a fundamental right not to have the State endorse and give effect to private biases. Like *Reitman,* no court or commentator has ever viewed *Palmore,* either alone or in combination with other cases, as having applied fundamental right analysis.

The district court further found that the citation to *Palmore* in *City of Cleburne* was significant. *City of Cleburne,* however, did not apply the strict scrutiny standard of review and stands only for the proposition that irrational biases cannot, in and of themselves, qualify as a legitimate governmental interest to satisfy rational basis review. The district court also mentioned *Pruitt,* a Ninth Circuit case involving discrimination against homosexuals in the military, because it also cited to *Palmore. Pruitt,* however, like *City of Cleburne,* did not apply the strict scrutiny standard of review. As such, neither case can be read as applying fundamental rights analysis.

The cases relied on by the district court as recognizing a fundamental right not to have the State endorse and give effect to private biases do not apply fundamental rights analysis, but rather involve traditionally suspect classifications or the application of rational basis review. Accordingly, I conclude that the district court's issuance of the preliminary injunction in this case was based on the application of an erroneous legal premise that has never been recognized by the Supreme Court.

### III

I am also compelled to address the "fundamental right to participate equally in the political process" because the majority, applying de novo review to the district court's legal conclusion, upholds the granting of the preliminary junction based on its recognition of, and reliance on, a different fundamental right than that identified by the

district court.[10] In my view, the majority's underlying legal premise that Supreme Court precedent has recognized such a fundamental right is also erroneous and provides no support for the conclusion that the strict scrutiny standard of review applies in this case.

The majority's extensive review of prior Supreme Court decisions indicates that language discussing citizen participation has appeared in a variety of contexts in numerous equal protection opinions. The traditional reading of these cases, however, suggests that the majority's analysis suffers from the same flaw as the district court's analysis—at no point has the Supreme Court explicitly identified the fundamental right that the majority extrapolates from the Supreme Court decisions on which it relies.

Appropriately categorized, there is no more of a common thread uniting the decisions cited by the majority than there is a common thread of logic or precedent to support the district court's analysis.[11] In

my view, the cases cited by the majority all fall within Supreme Court decisions that address either the fundamental right to vote or ballot access, or opinions that involve suspect classifications. Based on a review of each of these three categories, I conclude that the majority's underlying legal premise that the Supreme Court has recognized a fundamental right to participate equally in the political process is erroneous.

A

In a long series of cases beginning with *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court has held that there is a fundamental right to have one's vote counted equally. *See 2 Treatise on Constitutional Law* § 15.7, at 435; *e.g., Kramer v. Union Free Sch. Dist.,* 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).[12]

**10.** I note that in reviewing a preliminary injunction that has been granted by a trial court, we are not *required* to analyze the alternative grounds raised by the parties before the trial court, but not ruled on, or to discuss grounds not raised below by the parties. Based on the limited grounds on which this case is before us, we need not analyze the assertion of the appellees that a preliminary injunction could have been properly issued based on a fundamental right to participate equally in the political process any more than we need address the original assertions of the appellees that Amendment 2 violated their (1) fundamental right to freedom of expression; (2) fundamental right to petition the government for redress of grievances; or (3) fundamental right to vote. Recognizing this fact, the appellees assert on appeal that the district court's ruling is best construed as holding that Amendment 2 infringes upon the fundamental right of political participation. *See supra* note 5.

Because the district court's ruling cannot be so construed, the majority justifies upholding the injunction on a different legal basis than that relied on by the district court by citing *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 428 (Colo.1991). Neither the majority nor the appellees cite to any case where an appellate court has upheld a preliminary injunction based on different legal grounds than those articulated and relied on by the trial court. However, I agree that if a trial court erred in applying the applicable law, an appellate court, pursuant to its ability to review the underlying legal premis-

es de novo, may apply the correct legal standard and uphold the injunction if supported by the record. *See Rowland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 385 (7th Cir.1984) (stating that any purely legal determination made by a trial judge in granting or denying a preliminary injunction is subject to plenary appellate review).

**11.** The majority's suggestion that a fundamental right to participate equally in the political process encompasses a wide variety of Supreme Court equal protection opinions in many ways is akin to the district court's delineation of the fundamental right it identified based on language drawn from other equal protection decisions.

**12.** The right to vote undoubtedly includes the right to participate in the *electoral* process by exercising the franchise. *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) ("this Court has made clear. that a citizen has a constitutionally protected *right to participate in elections* on an equal basis"); *2 Treatise on Constitutional Law* § 15.7, at 435; *cf.* Frank I. Michelman, *Conceptions of Democracy in American Constitutional Argument,* 41 Fla.L.Rev. 443, 459 n. 63 (1989) (characterizing the "right to participate in *elections* on an equal basis" as a fundamental right).

Neither the appellees nor the majority, however, contends that the right to participate in the *electoral* process is equivalent to the much more

Traditionally, both commentators and case book authors have characterized these decisions as recognizing a fundamental "right to vote" that is subject to the strict scrutiny standard of review. *See, e.g.,* John E. Nowak et al., *Constitutional Law,* ch. 16, § I at 765–76 (2d ed. 1983); 3 *Treatise on Constitutional Law* § 18.31, at 388–409; Russell W. Galloway, Jr., *Basic Equal Protection Analysis,* 29 Santa Clara L.Rev. 121, 150 (1989); James A. Kushner, *Substantive Equal Protection: The Rehnquist Court and the Fourth Tier of Judicial Review,* 53 Mo.L.Rev. 423, 429–33 (1988); David M. Treinman, *Equal Protection and Fundamental Rights—A Judicial Shell Game,* 15 Tulsa L.J. 183, 195–202 (1980); *see generally* Gerald Gunther, *Constitutional Law* 787–823 (11th ed. 1985); William B. Lockhart et al., *Constitutional Law: Cases–Comments–Questions* 1316–56 (6th ed. 1986); Ronald D. Rotunda, *Modern Constitutional Law* 598–613 (3d ed. 1989).

The majority recognizes that the decisions it cites involving reapportionment or direct restrictions on the exercise of the franchise are readily distinguishable from the present case. The reason that these cases are distinguishable is because they all involve the well-settled fundamental right to vote. *See, e.g., Kramer,* 395 U.S. at 627, 89 S.Ct. at 1890 ("if a challenged state statute grants the *right to vote* to some bona fide residents ... and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest"); *Harper,* 383 U.S. at 667, 86 S.Ct. at 1082

("the political franchise of *voting [is] a fundamental political right*"); *Reynolds,* 377 U.S. at 562, 84 S.Ct. at 1381 ("the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the *right of citizens to vote* must be carefully and meticulously scrutinized"); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964) ("even the most basic [rights] are illusory if the *right to vote* is undermined").

As such, an extended analysis of these cases is not necessary to reach the conclusion that the Supreme Court decisions cited by the majority involving reapportionment or direct restrictions on the exercise of the franchise all fall within the jurisprudence addressing the fundamental right to vote and not within a broader-based fundamental right to participate equally in the political process. My conclusion is not only supported by the language quoted above, but also represents the traditional view of constitutional commentators and case book authors. *See* Nowak et al., *Constitutional Law,* at 765–76; 3 *Treatise on Constitutional Law* § 18.31, at 388–409; *e.g.,* Gunther, *Constitutional Law,* at 787–823; Lockhart et al., *Constitutional Law,* at 1316–56; Rotunda, *Modern Constitutional Law,* at 598–613; Galloway, *Basic Equal Protection Analysis,* 29 Santa Clara L.Rev. at 150–52; Kushner, *Substantive Equal Protection,* 53 Mo.L.Rev. at 429–33; Treinman, *Equal Protection and Funda-*

---

expansive right to participate in the *political* process. *See generally* Laurence H. Tribe, *American Constitutional Law* § 13–1, at 1062 (2d ed. 1988) (characterizing political participation rights as "rights poised between procedural due process and the freedoms of expression and association"). Nor does the majority assert that in this case Amendment 2 infringed on the appellees' fundamental right to vote.

Notably, in their general discussion of fundamental rights in their brief before the district court, the appellees mentioned only the fundamental right to vote (including the right to participate in the electoral process) and not the more expansive fundamental right upon which they sought the injunction. The appellees stated:

The two branches of equal protection law are distinct. Rights considered "fundamental" for equal protection purposes include the right to interstate travel (burdened by residency requirements); *the right to electoral participation, including the right to vote* (burdened by various qualifications and obstacles); the right of access to the courts (burdened by fees); and the right of privacy (burdened by laws affecting rights to procreation and family).

By doing so, the appellees appear to concede that the fundamental right to participate in the political process has yet to be identified by the Supreme Court.

*mental Rights—A Judicial Shell Game,* 15 Tulsa L.J. at 195–202.

The fact that the appellees initially claimed before the district court that Amendment 2 would infringe upon the fundamental right to vote, in addition to asserting that Amendment 2 would infringe upon the fundamental right to participate equally in the political process, further buttresses this conclusion. *See also supra* note 12 (recognizing the implicit acknowledgement of the appellees that the fundamental right to participate equally in the political process has not been identified as a fundamental right).

### B

In addition to recognizing that any infringement on the fundamental right to vote is subject to the strict scrutiny standard of review under the Equal Protection Clause, the Supreme Court has concluded in a separate line of decisions that regulations involving ballot access may implicate the Equal Protection Clause. The Constitution does not contain any express provision that guarantees individuals the right to become a candidate, and the Supreme Court has never recognized a fundamental right of candidates to be listed on ballots. Nevertheless, the ballot access decisions indicate that heightened, although not strict, judicial scrutiny is required based on a combination of the fundamental right to vote and the First Amendment right of association. *See* 3 *Treatise on Constitutional Law* § 18.32, at 411; Galloway, *Basic Equal Protection Analysis,* 29 Santa Clara L.Rev. at 152; *e.g., Burdick v. Takushi,* —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

Admittedly, the Supreme Court has minimized the extent to which voting rights cases are distinguishable from ballot access cases, *Burdick,* —— U.S. at ——  ——, 112 S.Ct. at 2065–66, and the early decisions within this category employed the strict scrutiny standard of review. *See*

*Williams,* 393 U.S. at 30, 89 S.Ct. at 10. Notably, however, the Supreme Court's more recent cases clearly indicate that the strict scrutiny standard of review does not apply to ballot access cases. *See Burdick,* —— U.S. at ——, 112 S.Ct. at 2060 (involving the open use of a balancing test); *Anderson,* 460 U.S. at 780, 103 S.Ct. at 1564 (same).

In *Burdick,* for example, the petitioner characterized the case as a right to vote case rather than as a ballot access case in an attempt to convince the Supreme Court that the strict scrutiny standard of review applied. *Burdick,* —— U.S. at ——, 112 S.Ct. at 2065. While recognizing the two different categories of case law, *Burdick* rejected the characterization of the case offered by the petitioner and specifically found that the strict scrutiny standard of review did not apply. *Id.* at ——, 112 S.Ct. at 2066. Instead, *Burdick* applied the balancing test that the Supreme Court adopted in *Anderson.*

The decisions cited by the majority falling within the ballot-access category of cases address entirely distinct questions and constitutional problems from the present case and do not apply the strict scrutiny standard of review. As such, any unifying principle linking these cases with decisions from other equal protection categories, is, in my view, attenuated.

### C

After citing language from particular equal protection decisions in the ballot access and right to vote contexts, the majority addresses the limited category of cases on which it principally relies as establishing explicit support for the recognition of a fundamental right to participate equally in the political process. *See* maj. op. at 1279–1282. According to the majority, the equal protection doctrine delineated in *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and subsequently addressed in *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), and *Washington v. Seattle School District No. 1,* 458 U.S. 457,

102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), supports its conclusion that the Supreme Court has recognized a fundamental right to participate equally in the political process.

In my view, a careful reading of these four cases highlights the fact that they are not fundamental rights cases at all, but instead address potential violations of the Equal Protection Clause based on traditionally suspect classifications, albeit in situations where the ordinary political process has been restructured. *See Citizens for Responsible Behavior v. Superior Court,* 1 Cal.App.4th 1013, 2 Cal.Rptr.2d 648, 655 (1991) (stating that *"Hunter* was a 'strict scrutiny' case in which the law invalidly classified the affected parties on the basis of traditionally suspect characteristics"); *cf.* Michael Klarman, *An Interpretative History of Modern Equal Protection,* 90 Mich.L.Rev. 213, 314 (1991) (stating that "[i]n the place of political process theory, the Justices have inserted a very different notion of equal protection—that racial classifications are presumptively unconstitutional because race almost invariably *should be* irrelevant to governmental decisionmaking"); Robert H. Beinfield, Note, *The Hunter Doctrine: An Equal Protection Theory that Threatens Democracy,* 38 Vand.L.Rev. 397, 405 (1985) (concluding that racial classifications provided the basis for the heightened level of judicial scrutiny in *Hunter*).

In *Hunter,* the Supreme Court addressed a city charter amendment repealing a racial anti-discrimination ordinance and requiring voter approval before such an ordinance could be enacted. *Hunter,* 393 U.S. at 387,

89 S.Ct. at 558. The Supreme Court initially concluded that it "need not rest on *Reitman* to decide" the case before it because "unlike *Reitman,* there was an explicitly racial classification [in *Hunter*]." *Id.* at 389, 89 S.Ct. at 560.[13] Nevertheless, *Hunter* characterized the amendment as placing "special burdens on *racial minorities* within the governmental process," *id.* at 391, 89 S.Ct. at 560–61 (emphasis added), and stated:

> Because the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on *race, racial classifications are "constitutionally suspect,"* and subject to the "most rigid scrutiny." They "bear a far heavier burden of justification" than other classifications.

*Id.* at 391–92, 89 S.Ct. at 560–61 (citations omitted) (emphasis added).[14]

Two years later, in *James,* 402 U.S. at 137, 91 S.Ct. at 1331, the Supreme Court was asked to apply *Hunter* in a case concerning the validity of a California constitutional measure prohibiting state public bodies from developing, constructing, or acquiring low-income housing projects until voters approved the project in a referendum. The federal district court relied on *Hunter* to find that the constitutional measure violated the Equal Protection Clause.

Under the broad reading of *Hunter* dictated by the majority, the federal district court's result should have been affirmed because the measure "involve[d] legislation which prevented the normal political institutions and processes from enacting partic-

**13.** *Hunter* did not state that it could not rely on *Reitman,* which was decided the previous term, but rather suggested that it did not have to rely on *Reitman* to declare the statute unconstitutional. This conclusion is not surprising given that the cases involved completely different factual settings—one statute that embodied an explicitly racial classification (*Hunter*) and one that did not (*Reitman*).

Amici curiae in this case correctly point out that while *Reitman* plainly involved political participation issues, the Court analyzed it solely as a race case. It is somewhat difficult to explain why the Supreme Court would have relied exclusively on suspect classification grounds in *Reitman* when it could have struck down the

statute based on the fundamental right that is today identified and embraced by the majority. In my view, the most logical explanation is that the Supreme Court simply did not recognize such a broad-based fundamental right. This explanation also accounts for the conspicuously superficial treatment that *Reitman* receives in the majority opinion.

**14.** Subsequent federal cases addressing *Hunter* characterized the opinion as involving an unconstitutional racial classification. *See, e.g., Tyler v. Vickery,* 517 F.2d 1089, 1099 (5th Cir. 1975); *Lee v. Nyquist,* 318 F.Supp. 710, 718–20 (W.D.N.Y.1970), *aff'd,* 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971).

ular legislation desired by an identifiable group of voters (*i.e.* poor people who would qualify for low-rent housing)." Maj. op. at 1278. In its attempt to place boundaries on the expansive fundamental right that it recognizes, limiting language requiring "the presence of an *independently identifiable group* of voters" appears throughout the majority's analysis. *See* maj. op. at 1276, 1281, 1282, 1283, 1284, 1285.[15] For example, the majority concludes that just as *Hunter* fenced out an independently identifiable group, so too does Amendment 2 expressly fence out the identifiable group of gay men, lesbians, and bisexuals. Maj. op. at 1285.

Under the majority's analysis, the strict scrutiny standard of review therefore should have applied in *James* based on the fundamental right to participate equally in the political process, because *James* involved a group (poor people who would qualify for low-rent housing) that "was 'independently identifiable' apart from the group created by the statute itself." Maj. op. at 1282. Just as "[t]he class singled out in *Hunter* was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations,' " *Gordon*, 403 U.S. at 5, 91 S.Ct. at 1892, the class singled out in *James* is equally clear—those who would benefit from local agency

decisions providing for low-rent housing projects.[16]

Despite these considerations, the Supreme Court did not apply the strict scrutiny standard of review. *James*, 402 U.S. at 143, 91 S.Ct. at 1334. Instead, *James* found that the strict scrutiny standard of review applied in *Hunter* not because a fundamental right existed and was infringed upon, but because the city charter amendment at issue in *Hunter* affected a traditionally suspect class:

> Unlike the case before us, *Hunter* rested on the conclusion that Akron's referendum law denied equal protection by placing *"special burdens on racial minorities* within the governmental process." ... Unlike the Akron referendum provision, it cannot be said that California's Article XXXIV rests on "distinctions based on race." ... The present case could be affirmed only by extending *Hunter*, and this we decline to do.

*Id.* at 140–41, 91 S.Ct. at 1333 (emphasis added). In this sense, I agree with the majority that *James* is "best understood" as a case where strict scrutiny analysis *did not apply* because the identifiable group challenging the constitutional measure was not recognized as a suspect classification, maj. op. at 1282 n. 21, and find *James* to be dispositive of the case before us.[17]

---

**15.** The basis for the limiting language seized upon by the majority is the Supreme Court's statement in *Gordon* that in contrast to *Hunter*, it could "discern no independently identifiable group or category that favors bonded indebtedness over other forms of financing." *Gordon*, 403 U.S. at 5, 91 S.Ct. at 1892. While the statement was certainly true in *Gordon*, it was also irrelevant to the equal protection analysis, as is evidenced by the fact that such language did not appear in *Hunter*, *James*, or *Washington*.

It is interesting, however, that the district court in this case also attempted to restrict the boundaries of the fundamental right not to have the state endorse and give effect to private biases by employing the same language.

**16.** Similarly, just as Amendment 2 precludes gay men, lesbians, and bisexuals from "seeking governmental action favorable" to them, maj. op. at 1285, and from enjoying the benefit of local provisions, so too did *James* preclude poor people who would benefit from low-rent housing from seeking governmental action favorable to them and from enjoying the benefit of previously adopted local agency decisions providing

low-rent housing projects. Moreover, the constitutional measure adopted in *James* precluded poor people who would benefit from low-rent housing from employing the "normal political institutions and processes," maj. op. at 1279, to seek low-rent housing projects by requiring the project to be approved by a majority of those voting at a community election. *James*, 402 U.S. at 138–39, 91 S.Ct. at 1332–33.

**17.** Justice Marshall, joined by Justices Brennan and Blackmun, dissented in *James* on the basis that a suspect classification was involved. Justice Marshall concluded that the constitutional provision at issue was "an explicit classification on the basis of poverty—a suspect classification which demands exacting judicial scrutiny, *see McDonald v. Board of Election*, 394 U.S. 802, 807, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739 (1969); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Douglas v. California* [372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) ], *supra*." *James*, 402 U.S. at 144–45, 91 S.Ct. at 1335. Justice Marshall's view has never been adopted by the Supreme Court.

In explaining why the constitutional amendment at issue before it did not violate the Equal Protection Clause, however, *James* also cogently explained why *Hunter*, like *Reitman* before it, is "best understood" as a case where the strict scrutiny standard of review *did apply* because a traditionally suspect classification was involved. Before the Supreme Court, the appellees in *James* asserted that the mandatory referendum required by the constitutional amendment "hamper[ed] persons desiring public housing from achieving their objective when no such roadblock faces other groups seeking to influence other public decisions to their advantage." *James*, 402 U.S. at 142, 91 S.Ct. at 1334. In this way, an identifiable group was fenced out from the normal political processes. Nevertheless, the Supreme Court specifically rejected the assertion of the appellees that such a restructuring of the political process violated the Equal Protection Clause:

> [O]f course a lawmaking procedure that "disadvantages" a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group. And this Court would be required to analyze governmental structures to determine whether a gubernatorial veto provision or a filibuster rule is likely to "disadvantage" any of the diverse and shifting groups that make up the American people.

*Id.* In my view, the rejection of the assertion of the appellees in *James* weakens, and all but forecloses, the broad reading of *Hunter* offered by the majority.

Less than two months after *James*, the Supreme Court in *Gordon*, 403 U.S. at 1, 91 S.Ct. at 1890, again distinguished *Hunter* by indicating that the reason the strict scrutiny standard of review was required in *Hunter* was because a traditionally suspect classification was involved. *Gordon* also involved a challenge by a group of interested citizens to a state's constitutional and statutory provisions, which in that case required a sixty-percent approval for any bonded indebtedness incurred by political subdivisions of the state. *Id.* at 2–3, 91 S.Ct. at 1890–1891.

In rejecting the equal protection claim, *Gordon* stated:

> Unlike the restrictions in our previous cases, the West Virginia Constitution singles out *no "discrete and insular minority"* for special treatment.... We are not, therefore, presented with a case like *Hunter v. Erickson*, 393 U.S. 385 [89 S.Ct. 557, 21 L.Ed.2d 616] (1969), in which fair housing legislation alone was subject to an automatic referendum requirement. The class singled out in *Hunter* was clear—"those who would benefit from laws barring *racial, religious, or ancestral discriminations.*"

*Id.* at 5, 91 S.Ct. at 1892 (emphasis added). As in *James*, the strict scrutiny standard of review did not apply in *Gordon* because the group challenging the constitutional measure could not establish membership in a discrete and insular minority that the Supreme Court recognized as a suspect classification. In this sense, *Gordon* is also "best understood" as a case where strict scrutiny analysis did not apply because a suspect classification was not involved.[18]

---

In determining whether a group is a suspect or quasi-suspect class, the Supreme Court has identified several criteria to be used. *San Antonio Indep. School Dist.*, 411 U.S. at 1, 93 S.Ct. at 1281; *see also supra* note 7 (discussing the origin of "discrete and insular minorities" language in footnote 4 of *Carolene Products*). Among others, the Supreme Court has indicated that the immutability of a group's identifying trait should be considered. *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973); *cf. Woodward*, 871 F.2d at

1076 (noting that "homosexuality, as a definitive trait, differs fundamentally from those defining recognized suspect or quasi-suspect classes").

**18.** The fact that *Gordon* could not discern any "independently identifiable group or category that favors bonded indebtedness over other forms of financing," while certainly true did not impact on the equal protection analysis. In *James*, where an identifiable group favoring low-income housing clearly existed, the Supreme Court nevertheless declined to apply strict scrutiny analysis because no traditionally

In *Washington*, 458 U.S. at 457, 102 S.Ct. at 3187, the Supreme Court for the first time struck down a statewide initiative based on *Hunter*. Because the initiative was drafted to terminate the use of mandatory busing to achieve racial integration in the Washington public school system, the Supreme Court found that it violated the Equal Protection Clause:

> [T]he political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process. State action of this kind, the Court said, "places *special* burdens on racial minorities within the governmental process," thereby "making it *more* difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest."

*Id.* at 470, 102 S.Ct. at 3195 (citations omitted).

That *Washington*'s analysis was driven by the traditionally suspect classification involved in the case is further suggested by its reaffirmation of the principle of *Hunter* that meaningful and unjustified distinctions based on race are impermissible:

When the political process or the decisionmaking mechanism used to *address* racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the governmental action plainly "rests on 'distinctions based on race.'" *James v. Valtierra*, 402 U.S., at 141 [91 S.Ct. at 1333], quoting *Hunter v. Erickson*, 393 U.S., at 391 [89 S.Ct. at 560].

*Id.* at 485–86, 102 S.Ct. at 3202–03.[19]

The foregoing review of *Hunter* and its progeny highlights my conclusion that the Supreme Court has never focused on the fundamental right of an independently identifiable group (*i.e.*, poor people who would benefit from low-income housing) to participate equally in the political process. Rather, each of the four cases specifically focuses attention "on the special *burdens on racial minorities* within the governmental process." *See Washington*, 458 U.S. at 458, 102 S.Ct. at 3188; *Gordon*, 403 U.S. at 5, 91 S.Ct. at 1891; *James*, 402 U.S. at 141, 91 S.Ct. at 1333; *Hunter*, 393 U.S. at 391, 89 S.Ct. at 560. Because all four decisions were driven by traditional strict scrutiny analysis involving a suspect classification, the fact that the regulations at issue in each occurred within the context of the political process was not dispositive.

## D

It is clear that language discussing citizen participation has appeared in a variety

---

suspect classification was involved. *See supra* note 17 and accompanying text.

**19.** My conclusion is further supported by *Crawford v. Board of Educ.*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), a Supreme Court opinion announced the same day as *Washington* that involved a similar attempt by state voters to restrain busing plans. In *Crawford*, however, the Supreme Court upheld a state constitutional amendment providing that state courts could not order mandatory student assignment or transportation unless a federal court would do so to remedy a violation of the Equal Protection Clause. *Id.* at 529, 102 S.Ct. at 3213.

The petitioners asserted that the constitutional amendment fell within *Hunter* because it employed an "explicit racial classification" and imposed a "race-specific burden on minorities." *Id.* at 536, 102 S.Ct. at 3217. *Crawford* agreed that if the constitutional amendment employed a racial classification, the strict scrutiny standard of review would apply, but found *Hunter* inapplicable to the case before it because the amendment did "not embody a racial classification." *Id.* at 536–37, 102 S.Ct. at 3217. In this way, the constitutional amendment in *Crawford* differed from the amendment in *Washington* which embodied an explicit racial classification by reallocating decision-making authority in such a way as to make it more difficult for individuals to obtain legislation in their interest because of their race. *See* 3 *Treatise on Constitutional Law* § 18.9(3)(f), at 137; *The Supreme Court 1981 Term*, 96 Harv.L.Rev. 1, 120–30 (1982). The Supreme Court also stressed that having gone beyond the requirements of the Fourteenth Amendment, the state was free to return to the standards of the federal Constitution. *Crawford*, 458 U.S. at 542, 102 S.Ct. at 3220.

of contexts in Supreme Court equal protection opinions addressing the fundamental right to vote, ballot access, and suspect classifications. To date, however, the Supreme Court has never explicitly stated that a fundamental right to participate equally in the political process exists that is subject to the strict scrutiny standard of review. Nor has the Supreme Court found such a fundamental right within the penumbras of the Constitution. Therefore, I cannot agree with the majority's underlying legal premise that the Supreme Court has recognized such a fundamental right to support the strict scrutiny standard of review in this case.[20]

In my view, rather than expressing a willingness to extrapolate new fundamental rights based on selective language from prior Supreme Court decisions, we should exercise caution in identifying and embracing previously unrecognized fundamental rights. *See Bowers,* 478 U.S. at 194–95, 106 S.Ct. at 2846 (stating that "there should be, therefore, great resistance to expand the substantive reach of those Clauses, particularly if it requires redefining the category of rights deemed to be fundamental"); *Dronenburg,* 741 F.2d at 1396 (stating that "[i]f it is in any degree doubtful that the Supreme Court should freely create new constitutional rights, we think it certain that lower courts should not do so").

At some point in the future, the Supreme Court may agree with the majority's underlying legal premise and identify such an expansive fundamental right to participate equally in the political process. Such a substantive due process decision would most likely conduct an analysis similar to previous Supreme Court decisions and address the importance of the right, relevant Constitutional provisions, the history and traditions of our country, and whether the right is implicit in the concept of ordered liberty. The fact that such analysis is not present in the Supreme Court precedent cited by the majority cautions against the recognition of such a fundamental right.

I am also troubled by the broad reading given to the Supreme Court cases relied upon by the majority because it is contrary to the underlying principles of *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975). Under *Hass,* a state court cannot impose a restriction as a matter of federal constitutional law that the Supreme Court has specifically refrained from adopting. *Id.* In *James,* the Supreme Court confronted an equal protection challenge by an identifiable group of persons who had been fenced out by the majority's alteration of their access to the political process. Because *James* explicitly refrained from extending *Hunter* to declare a fundamental right to participate equally in the political process when it rejected the appellees' assertion in that case, we are constrained by the principles of *Hass* from doing so now. *See People v. Cisneros,* 855 P.2d 822 (Colo.1993) (Erickson, J., concurring) (citing *Hass,* 420 U.S. at 719, 95 S.Ct. at 1219); *see also DiLeo v. Board of Regents,* 196 Colo. 216, 590 P.2d 486, 491 (1978) (Erickson, J., dissenting) (only the United States Supreme Court can pronounce the final word on whether the strict scrutiny standard of review or the rational basis standard of review applies). Rather, a straightforward application of

---

**20.** The majority's underlying premise that Amendment 2 violates a fundamental right to participate equally in the political process is also difficult to reconcile with the constitutional and statutory provisions of twenty-one states denying individuals convicted of certain crimes, even if the individual is no longer incarcerated, from being elected to, or from holding public office. *See* Steven B. Snyder, *Let My People Run: The Rights of Voters and Candidates Under State Laws Barring Felons from Holding Elective Office,* 4 J.L. & Pol. 453 app. A (1988) (listing jurisdictions that specifically disqualify ex-felons from holding public office).

It is hard to imagine any greater form of participation in the political process than serving as an elected or appointed public official. Nonetheless, twenty-one states completely deny this aspect of political participation to the independently identifiable group of previously convicted felons. Notably, none of these provisions have been struck down based on an equal protection challenge for infringing on a fundamental right to participate equally in the political process.

*James* indicates that the strict scrutiny standard of review does not apply in this case.

## IV

In my view, the district court's underlying legal premise that the Supreme Court has recognized a fundamental right not to have the State endorse and give effect to private biases is erroneous. Similarly, the majority's underlying legal premise that the Supreme Court has recognized a fundamental right to participate equally in the political process is erroneous. Because Supreme Court precedent does not support the evaluation of Amendment 2 under the strict scrutiny standard of review, I would reverse and discharge the entry of the preliminary injunction, and remand for trial on the permanent injunction.